```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JOSE COLON,                                           :
                Petitioner,                           :    05 Civ. 7053 (GBD) (GWG)
       -v.-                                           :    **REPORT AND
                                                           RECOMMENDATION**
PEOPLE OF THE STATE OF NEW YORK,                      :
                Respondent.                           :
------------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Jose Colon, proceeding pro se, brings this petition for a writ of habeas corpus challenging his July 2002 conviction in the New York State Supreme Court, Bronx County, following his plea of guilty to two counts of Murder in the Second Degree (New York Penal Law ("N.Y.P.L.") § 125.25). He was sentenced to a term of imprisonment of 30 years to life. He is currently incarcerated at Auburn Correctional Facility. For the reasons stated below, the petition should be denied.

I. BACKGROUND

   A. Facts

The following relevant facts are derived from the statement Colon gave to police on December 11, 1999, as recorded and recounted by Detective John Wall during a pre-trial hearing. See H. 18-24.[1] Colon subsequently admitted to most of these facts in his plea colloquy. See P. 11-15.

---

[1] "H." refers to the transcript of the pre-trial suppression hearing held on April 23, 2001 (Docket #14). "P." refers to the transcript of the plea, held on April 24, 2001 (Docket #12). "W." refers to the transcript of the hearing on Colon's motion to withdraw his plea, held on December 18, 2001, and February 27, 2002 (Docket #11). "S." refers to the transcript of the sentencing, held on July 10, 2002 (Docket #13).

On December 10, 1999, Colon and David Rodriguez forced their way into the apartment of Antonia and Carlos Pena, at 1965 Lafayette Avenue in the Bronx, in order to steal jewelry that Mrs. Pena sold out of the apartment. See H. 23; P. 13. Colon knew Mr. and Mrs. Pena because he had previously purchased a "pre-engagement ring" for his girlfriend from them. See H. 18. According to Colon's statement, a man named Lenny had come up with the idea of the robbery, and had forced him to do it at gunpoint. See H. 19-22.

In the course of the robbery, Colon shot Mrs. Pena in the stomach, and then, because she "was screaming real loud," he shot her again "while she was on the ground." See H. 23; P. 13. He also shot Mr. Pena, stating that he "pulled the trigger once but two shots went off and I hit him in the shoulder and Mr. Pena fell to the floor." See H. 23. Both Mr. and Mrs. Pena died. Colon and Rodriguez then ran out of the apartment and discarded the gun used to commit the murders in some nearby bushes. See H. 23-24.

B. Colon's Plea

On April 24, 2001, the trial judge conducted a plea colloquy with Colon and Rodriguez. The judge first asked whether Colon was "fully satisfied" with the representation of his lawyer, Robert Saltzman. Colon answered, "Yes." See P. 4-5. The judge then asked whether Colon had completely discussed the case with Saltzman, and whether he was agreeing to plead guilty. Again Colon answered, "Yes." See P. 5. The judge explained to Colon that by pleading guilty he was giving up his right to a trial and the rights associated with trial, including the right to confront the witnesses against him, the right to testify on his own behalf, the right to introduce evidence, and the right to remain silent. See P. 6-8. Colon indicated that he understood he was giving up each of these rights. See id. The judge then asked whether Colon was pleading guilty

"freely and voluntarily because you are in fact guilty?" Colon answered, "Yes." See P. 10. Colon also confirmed that no one had forced him to plead guilty or threatened him in any way. See P. 10. The judge explained that he would sentence Colon to 15 years on each count, with the sentences to run consecutively, for a total sentence of 30 years to life. See P. 10. Colon admitted that he had gone to the apartment of Mrs. Pena to rob her; that he was armed with a .22 caliber rifle; that he pointed the rifle at and shot both Mrs. Pena and her husband with the intent to cause their deaths; and that he and Rodriguez took jewelry from the apartment afterwards and divided it between them. See P. 11-15. Colon then withdrew his previous plea of not guilty and pled guilty to two counts of murder in the second degree. See P. 16.

    C. Colon's Motion to Withdraw His Plea

On October 17, 2001, Colon moved to withdraw his guilty plea through new counsel, Oliver Smith, pursuant to New York Criminal Procedure Law ("CPL") § 220.60(3). He claimed that his plea was "the product of the failure of prior counsel . . . to explore certain factors [specifically, his alleged psychiatric problems] that could have been proffered as a defense or at least as mitigation evidence in this case." See Affidavit in Opposition, filed Feb. 10, 2006 (Docket #7) ("Kaplan Aff."), ¶ 6. Colon also claimed that his plea was not knowing, voluntary, and intelligent, because he was not able to speak to his mother on the day he pled. See id. At a hearing on the motion to withdraw the plea, Colon's attorney called his mother, Lisa Coss, to testify about Colon's mental health history, and called his former attorney, Robert Saltzman, to testify about his handling of the case. See W. 2-100.

### 1. Coss's Testimony

Coss testified that Colon had "behavioral problems" and was "acting out" beginning in nursery school. See W. 4. She stated that he was diagnosed at age eight as being "severely depressed," and that as a result he began to receive counseling. See W. 6. When Colon was nine or ten, another evaluation determined that he had Tourette syndrome and was "severely emotionally disturbed." See W. 7. Around this same time, Colon began taking Haldol for his problems. See W. 9. Coss stated that when Colon was about 12, she sent him to Pleasantville Cottage School, where he could be constantly supervised and receive psychological counseling. See W. 9-10. He attended this school for approximately three years. See W. 10. He also began taking Tegretol for "rage control." See W. 10, 27. Coss also stated that Colon had a cat when he was a child, and that he mistreated it because he believed the cat would "squeal" on him to Coss. See W. 10-11. Coss stated that Colon stopped receiving psychological counseling and stopped taking medications at the age of 15, and that this was still the case at age 17, when he committed the murders. See W. 11-12, 24-25. Finally, Coss testified that she told Colon's trial attorney, Robert Saltzman, about his history of mental health problems, see W. 13-14, and that Saltzman replied, "[Y]our son is not insane. I'm not going that way." See W. 14.

### 2. Saltzman's Testimony

Saltzman testified that he interviewed Colon's family, and that during these interviews he learned that Colon "had a troubled childhood. That he was in special schools. That he had problems in school and things of that nature which would have been relevant if there was a death penalty sought" against him. See W. 35-36. Upon being asked whether Colon "had a mental health issue," Saltzman replied, "Yes, that's correct. He had a mental health issue." See W. 36-

4

37. He added that he "didn't believe that it was relevant . . . because of my conversations with the defendant" – specifically, he stated, "I could not sustain the burden that the defendant didn't know the difference between right and wrong at the [time] of the commission of the crime." See W. 37-38. Saltzman went on to state that Colon told him he "knew at the time the crime was committed that it was wrong and he should not have killed anybody," and that Colon "wanted to rob people. . . . [A]nd he did [not] want to be identified as the person who committed the crime." See W. 39-40. He also stated that Colon was fully aware of what was happening in court. See W. 68-69 (Colon "knew I was his lawyer. He knew who the judge was. He knew the difference between right and wrong. . . . He was always cognizant. He never talked about hallucinations. . . . He never said anything to people indicating he was acting without the confines of his right mind. . . . He . . . never indicated he didn't understand what was going on.").

Saltzman testified that after reviewing discovery materials, he told Colon, "I'm not taking your plea unless you did it. On numerous occasions he told me he did it." See W. 67. For example, Saltzman testified, during plea negotiations in court, "I walked over to [Colon] and I said listen, if I get you the 30 to life would you take it. Did you do it. And he said yes, I'll take it. Yes, I did it." See id.

With regard to documentary investigation, the following exchange took place between Saltzman and Colon's then-current attorney, Oliver Smith:

> Q: The question is, were you aware that his mental health issue went back to when he was six years old?
> A: Yes.
> Q: Did you subpoena any of his medical records?
> A: No.
> Q: Did you speak to any of his medical doctors?

5

> A: No.
> THE COURT: Did you have any conversations with the defendant's mother or the defendant about whether or not he was involved in any period of therapy for the 18 months or so prior to this incident.
> A: Yes.
> . . .
> Q: And were you aware that he was in therapy before that period of time.
> A: I believe he was, yes.
> Q: And were you aware that he was receiving medication before that period of time.
> A: I knew he had received medication in the past, yes.
> Q: Did you ascertain whether or not the failure of him to continue therapy would have any effect on his actions?
> A: No.
> Q: Did you ascertain whether or not his failure to receive any medication would have any effect on his actions?
> A: No.
> Q: Were you also aware that he was [a person diagnosed with Tourette syndrome]?
> [A:] No.
> Q: Were you aware that he was a person who was the subject of a study of [Tourette] syndrome and rage in children, were you aware of that?
> A: No.
> Q: Would you agree with me that if you had [subpoenaed] his medical records that information could have become known to you?
> A: I don't no [sic].

See W. 42-44.

When Smith asked whether Saltzman ever attempted "to get an independent mental health examiner assigned to assist you for representation in this case," Saltzman replied, "No." See W. 52. With regard to the issue of duress, Smith asked whether Saltzman made "any attempt to speak with any doctors to ascertain given Mr. Colon's specific mental situation, if he would be more acceptable [sic] to threats than another individual," to which Saltzman replied, "That never arose." See W. 57. When Smith asked whether Saltzman had taken Colon's "background history" of mental health into consideration when negotiating his plea, Saltzman replied that he had, and had been able to get the prosecutor down from a sentence of 50 years to life to a sentence of 30 years to life by "[taking] advantage of his background history." See W. 58.

6

Saltzman added, "I brow beat [the prosecutor] about [Colon's troubled childhood] and I brow beat Judge Marcus about that. Once the defendant admitted he had did [sic] the crime and he would take the 30 to life." See W. 63-64.

The prosecutor subsequently represented to the Court that she had originally sought 50 years to life for Colon, and that "Mr. Saltzman argued strenuously . . . that we give this defendant 30. . . . And the People continuously said we would never go below 30 to life and we would prefer to try the case and that was our bottom." See W. 89-90.

The court denied the motion to withdraw the plea, finding that Saltzman had provided effective representation of Colon. See W. 98-99. Specifically, it found that Saltzman did not subpoena any medical records "because after his discussion with the defendant over a period of time, his analysis of the evidence, he did not believe that there was . . . an affirmative defense of mental disease or defect." See W. 94. The court further noted that "there has been nothing introduced in the way of medical testimony to suggest that the defendant in any way was suffering from any mental diseases or defect." See W. 94-95.

D. Sentence and Direct Appeal

On July 10, 2002, the court sentenced Colon to a combined term of imprisonment of 30 years to life. See S. 6. In September 2003, Colon appealed his conviction, arguing that: (1) his plea should have been vacated based on ineffective assistance of counsel because his attorney failed to perform even the most minimal investigation into his mental health history; and (2) his sentence was excessive. See Brief for Defendant-Appellant, dated Sept. 2003 (reproduced as Ex. 1 to Kaplan Aff.) ("Def. App. Br."), at 16-24. The Appellate Division affirmed his conviction and sentence on March 24, 2003. See People v. Colon, 5 A.D.3d 275 (N.Y.A.D. 1st Dep't

2004). The court found that the trial court had properly denied Colon's motion to withdraw his plea because his counsel had "reasonably concluded that no psychiatric defense would have any hope of success, and instead made effective use of defendant's mental health background as a means of obtaining a plea offer that was as lenient as possible, given the heinous circumstances of this double murder." See id. at 275 (citing People v. Ford, 86 N.Y.2d 397, 404 (1995); People v. Benevento, 91 N.Y.2d 708, 713-14 (1998); Strickland v. Washington, 466 U.S. 668 (1984)). The Appellate Division further found "no basis for reducing the sentence." See id. The Court of Appeals denied Colon leave to appeal the Appellate Division's ruling on June 4, 2004. See People v. Colon, 3 N.Y.3d 638 (2004).

E. The Instant Petition

Colon timely submitted the instant petition on January 31, 2005. See Petition Under 28 USC § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed Aug. 9, 2005 (Docket #1) ("Petition"). In it, he raises the same two grounds for relief that he raised in his direct appeal: (1) that his counsel was ineffective for failing to investigate his history of mental health problems; and (2) that his sentence is excessive. See Petition ¶ 12. On February 10, 2006, Respondent filed opposition papers. See Kaplan Aff.; Memorandum of Law (attached to Kaplan Aff.) ("Resp. Mem.").

II. APPLICABLE LAW

A. Law Governing Petitions for Habeas Corpus

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

8

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (internal quotation marks and citations omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited. See Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) (internal quotation marks omitted); accord Rosa v. McCray, 396 F.3d 210, 220 (2d Cir. 2005) ("This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision.").

In Williams v. Taylor, the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. 362, 405-06 (2000). Williams also held that habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief

9

"simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been "objectively unreasonable." Id. at 409.

In addition, under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Errors of state law are not subject to federal habeas review. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). To be entitled to habeas relief a petitioner must demonstrate that the conviction resulted from a state court decision that violated federal law. See, e.g., id. at 68.

B. Law Governing Ineffective Assistance of Counsel

To show ineffective assistance of counsel, a petitioner must satisfy both prongs of the two-part test articulated in Strickland, 466 U.S. 668. The Strickland test has been characterized as "rigorous" and "highly demanding." See Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001) (internal quotation marks and citations omitted). To meet Strickland, a petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694; accord Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003); see also Massaro v. United States, 538 U.S. 500, 505 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").

In evaluating the first prong – whether counsel's performance fell below an objective standard of reasonableness – "'[j]udicial scrutiny . . . must be highly deferential'" and the

petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted); see also Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (affording counsel a presumption of competence). In assessing whether an attorney's conduct was constitutionally deficient, "[t]he court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; accord Pavel, 261 F.3d at 216. Concerning the second prong – whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different – a court "requires some objective evidence other than defendant's assertions to establish prejudice." Pham, 317 F.3d at 182 (citing United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)). "A 'reasonable probability' in this context is one that 'undermine[s] confidence in the outcome.'" Pavel, 261 F.3d at 216 (quoting Strickland, 466 U.S. at 694) (alteration in original).

The Supreme Court has expressly extended the application of the Strickland standard to ineffective assistance claims arising out of the plea process. See Hill v. Lockhart, 474 U.S. 52, 57 (1985).

III. DISCUSSION

    A. Ineffective Assistance of Counsel

In his petition Colon contends that Saltzman provided ineffective assistance when he "failed to perform even the most minimal investigation into petitioner's lengthy mental health history – a crucial factor that could have affected the outcome of the case." See Petition ¶ 12; Def. App. Br. at 16-22. The Appellate Division rejected this claim on the merits, see 5 A.D.3d at

11

275, and thus we consider whether that decision was contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d).

As a general matter, strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." See Strickland, 466 U.S. at 690-91. In this case, Saltzman's interviews with Colon's family had made him aware that Colon had a "mental health issue." See W. 36-37. He did not make additional inquiry, however, because his own conversations with Colon had convinced him that Colon "knew at the time the crime was committed that it was wrong and he should not have killed anybody." See W. 37, 39. Saltzman also stated that Colon was fully aware of what was happening in court. See W. 68-69. Based on Saltzman's own observation of Colon and Saltzman's conversations with Colon regarding his understanding of his actions on the day of the murder, it was well within the wide range of professionally competent assistance for Saltzman to conclude that it was unnecessary to seek additional psychiatric evidence for an insanity defense, to seek a determination that Colon was not competent to stand trial, or, given the circumstances of the murder, to pursue a defense of extreme emotional disturbance under N.Y.P.L. § 125.25(1)(a). See, e.g., Medina v. McGinnis, 2004 WL 2088578, at *22 (S.D.N.Y. Sept. 20, 2004) ("Since [defense counsel] was able to communicate with [defendant] and . . . had no reason to suspect that [defendant's] mental disease rose to the level of incompetence, it was not unreasonable for [counsel] to not request a competency hearing.").

To the extent that Colon is arguing that "it behooved [Saltzman] to use every single mitigating factor available to him to obtain a favorable plea," see Def. App. Br. at 21 (emphasis omitted), and that the acquisition of additional detail regarding his background "could have

12

influenced the course of the plea negotiations if Saltzman had presented the complete picture," see id. at 21-22, this claim too fails under the Strickland analysis. First, given the heinousness of Colon's crime and the strength of the evidence against him, counsel could have reasonably concluded that it would add nothing to the plea negotiations if he were to acquire more details on the nature of Colon's psychiatric history. Cf. Strickland, 466 U.S. at 699 ("Trial counsel could reasonably surmise from his conversations with respondent that character and psychological evidence would be of little help" at sentencing hearing following guilty plea).

Second, there is no evidence that Colon was prejudiced by Saltzman's decision not to further investigate his mental health history, see Pham, 317 F.3d at 182 (requiring "some objective evidence other than defendant's assertions to establish prejudice"). Saltzman in fact relied on Colon's "background history" in negotiating his plea down from the maximum sentence of 50 years to life, which the prosecutor originally sought, to a sentence of 30 years to life. See W. 58, 89-90. The prosecutor had stated unequivocally that "the People continuously said we would never go below 30 to life and we would prefer to try the case and that was our bottom." See W. 90. Thus, Colon has shown no prejudice from any alleged failure to obtain further psychiatric evidence.

In sum, the Appellate Division's conclusion that Colon was afforded effective assistance of counsel was not contrary to or an unreasonable application of clearly established federal law.

B. Excessive Sentence

Colon contends that his sentence is "excessive and should be reduced in the interests of justice." See Petition ¶ 12. Respondent argues that this claim is unexhausted because Colon did not raise it in federal constitutional terms in the state courts. See Resp. Mem. at 14-17. It is

13

unnecessary to reach the question of exhaustion, however, because this claim would have to be denied on the merits.

Because a habeas court must grant considerable deference to legislatively mandated terms of imprisonment, successful challenges to sentences are "exceedingly rare." See Hutto v. Davis, 454 U.S. 370, 374 (1982) (per curiam) (citation omitted). Indeed, the Second Circuit has broadly stated that "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); accord Diaz v. Herbert, 317 F. Supp. 2d 462, 479-80 (S.D.N.Y. 2004); Herrera v. Artuz, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001); Sutton v. Herbert, 39 F. Supp. 2d 335, 337 n.1 (S.D.N.Y. 1999).

Colon pled guilty to two counts of second degree murder, which is a class A-I felony in New York State. See N.Y.P.L. § 125.25. For a class A-I felony, the minimum period of imprisonment is up to twenty-five years, and the maximum is life. See N.Y.P.L. § 70.00(2)(a), (3)(a)(i). Multiple sentences are permitted to run consecutively. See N.Y.P.L. § 70.25(1). Thus, Colon's two sentences of 15 years to life – for a total of 30 years' to life imprisonment – were within the statutory range.

That the sentence is within the limits permitted by New York law does not entirely resolve the issue. The Eighth Amendment prohibits "extreme sentences that are grossly disproportionate to the crime." United States v. Snype, 441 F.3d 119, 152 (2d Cir. 2006) (citing cases) (internal quotation marks omitted); accord Solem v. Helm, 463 U.S. 277, 290 (1983); Bellavia v. Fogg, 613 F.2d 369, 376 (2d Cir. 1979). This, however, is not one of the "rare instances" where a "'reviewing court . . . [is] required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.'" Bethea v. Scully, 834 F.2d

257, 261 (2d Cir. 1987) (quoting United States v. Ortiz, 742 F.2d 712, 714 (2d Cir.), cert. denied, 469 U.S. 1075 (1984)). It is enough to say that a sentence of 30 years to life is not grossly disproportionate for a conviction for two murders in the second degree.

Conclusion

For the foregoing reasons, Colon's petition should be denied.

**PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. George B. Daniels at 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140, 144-45 (1985).

Dated: June 30 2006
New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Jose Colon
02-A-4378
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

Jacob Kaplan
Assistant District Attorney
215 East 161st Street
Bronx, New York 10451

Hon. George B. Daniels
United States District Judge

257, 261 (2d Cir. 1987) (quoting United States v. Ortiz, 742 F.2d 712, 714 (2d Cir.), cert. denied, 469 U.S. 1075 (1984)). It is enough to say that a sentence of 30 years to life is not grossly disproportionate for a conviction for two murders in the second degree.

## Conclusion

For the foregoing reasons, Colon's petition should be denied.

## **PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. George B. Daniels at 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140, 144-45 (1985).

Dated: June 30, 2006
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

15